Leo P. Curtin v. Commissioner.
Curtin v. Commissioner
Docket No. 7094.
United States Tax Court
1947 Tax Ct. Memo LEXIS 222; 6 T.C.M. (CCH) 457; T.C.M. (RIA) 47115; April 30, 1947
Chester B. McLaughlin, Esq., 36 W. 44th St., New York, N. Y., for the petitioner. John E. Mahoney, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1940 in the amount of $8,785.99. The two issues relate to the Commissioner's action in including in petitioner's taxable income 50% of the amount received by petitioner on account of the sale of certain patents but paid by him to his wife pursuant to an agreement, and reported by her for taxation; and in determining that the proceeds from that sale were taxable to petitioner as ordinary income rather than as capital gain. Findings of Fact A partial stipulation of facts was filed by the parties and we find *223 the facts therein to be as stipulated. Petitioner is an individual residing at Cranbury, New Jersey, who filed his income tax return for 1940 with the collector of internal revenue for the fifth district of New Jersey. Petitioner was employed, prior to 1927, by Western Union Telegraph Co. While in the employ of Western Union, he invented certain processes for the preservation of wood. Pursuant to his contract of employment these were transferred to Western Union, which granted to petitioner exclusive licenses outside of the field of electrical communications, with the understanding that he would make the process commercially available. Accordingly, in 1927 petitioner caused to be organized the Curtin-Howe corporation, to which he transferred the license which Western Union had granted him. He received from the Curtin-Howe Corporation 3,007 shares of capital stock out of 15,000 outstanding shares. He became its president, and was paid a salary which, by 1937, was $10,000 a year. He worked during this period until 1934, part time for Western Union, and part time for Curtin-Howe Corporation. Beginning in the latter part of 1930 petitioner began to work on, and successfully developed, *224 metal coating processes which became known as the "Oxalate" process, for which patent applications were filed on behalf of Western Union in 1931. Exclusive licenses for the use of these processes outside of the electrical communications field were granted to petitioner by Western Union, and on January 15, 1932, petitioner assigned all his rights under such exclusive licenses to the Curtin-Howe Corporation, and furnished to that corporation certain formulas for rust removing and bonding material, and for automobile top dressing. In consideration thereof, the corporation undertook the commercial development and exploitation of those products, and the payment to petitioner for a period of twenty years from date, but not until after the then existing corporate deficit had been eliminated, of a royalty of 7 1/2% of gross revenues, but not exceeding 50% of net revenues, derived from the use of the Oxalate process; 7 1/2% of its gross revenue from the rust removing and bonding and automobile top dressing until he should have received a total of $10,000. The contract further provided that the corporation would not grant any exclusive license to use the Oxalate process or sell its license without *225 the express consent of petitioner, and without the payment to him of one-half of its net profits from the sale. Petitioner's employment with Western Union ended in 1934, and thereafter he was employed only by the Curtin-Howe Corporation, as its president and principal salesman. In the early part of 1934, the petitioner invented a metal coating and rustproofing process which later became known under the trade name "Curtex." The invention was reduced to actual working process in February or March of 1935. This differed from other such processes, including the "Loxal" process, which was the same as "Oxalate," previously acquired by the Curtin-Howe Corporation, in that it could be applied in less time and could withstand the high temperature treatment of lacquers introduced in 1933 and 1934. On September 30, 1937, petitioner and the Curtin-Howe Corporation entered into a contract which contained the following provisions: * * *
Curtin, as owner of exclusive licenses to use and/or license others to use certain processes and/or inventions known as the Oxalate process for rustproofing iron, steel and other metallic substances for which letters patent have been issued or applied *226 heretofore, entered into a contract with the Company under date of January 14, 1932, providing for the transfer of Curtin's rights in said patents, the development and practice thereof by the Company. Curtin has acquired and developed additional processes in which the Company is interested. The parties deem it mutually advisable to make new and superseding arrangements regarding all of Curtin's rights in respect of rustproofing, coating and protective processes as hereinafter set forth. NOW, THEREFORE, in consideration of the premises the parties hereto have agreed and do hereby agree as follows: 1. Curtin hereby assigns and agrees to assign to the company all of his rights in, to and under inventions, processes, formulae, patents and applications for patents and licenses in and to the use of such inventions and patent rights in relation to the so-called "Oxalate" process, "Loxal" metal coating applied to iron copper plating process, siccative coating in connection therewith, zinc-oxy-sulphide coating (zincote), rustproof treatment and protection of metals generally, rust-removing and bonding materials and automobile top dressings now or hereafter during the term of this agreement, *227 owned or acquired by Curtin, and agrees from time to time as requested by the Company during the term of this agreement to execute any and all further instruments which may be necessary, proper or convenient for the transfer of any such rights to the Company. Curtin shall not be obligated to transfer any rights with respect to metal plating except copper plating process if such are not related to protective or rustproof coating. 2. The Company agrees to develop, exploit and practice such of the inventions and processes as shall be transferred to it hereunder or at the request of Curtin when not so developed or exploited to re-transfer and release to Curtin such of said inventions and processes with release under the terms hereof to Curtin, providing, however, that the Company shall not be required to return or release to Curtin any such inventions or processes as might in the opinion of the Company, if developed by others, affect the practice of the rights and inventions which the Company required pursuant to the terms hereof and has elected to develop, exploit and practice. 3. The Company agrees to pay Curtin in consideration of the assignment and disclosure of said rights, processes, *228 formulae, inventions and patents, on the fifteenth of each month commencing November 15, 1937, up to but not after December 31, 1955, royalty payments at the rate of six per cent (6%) of all gross revenues thereafter derived from the rustproofing and protective coating business of the Company during the calendar month next preceding such payment. It is mutually agreed that if for any month six (6%) per cent of the gross revenue shall exceed fifty (50%) per cent of the net profits realized by the company from said rustproofing and/or protective coating business of the Company, the royalty to be paid to Curtin hereunder for said month shall be reduced to an amount equal to fifty (50%) per cent of said net profits for said month. * * * [Here follow specifications for the computation of "gross revenue" and "net profits".] Said royalties shall be received by Curtin in full satisfaction and discharge hereunder. * * * [Further provision for determination of gross revenue and net income, and for inspection of books by public accountant.] * * *
5. Should the Company at any time desire to sell or transfer its rustproofing or protective coating business to anyone other than a person *229 or corporation under the control of the Company, including any reorganization in which the Company is included, it shall do so only with the consent in writing of Curtin thereto during his lifetime. After Curtin's death the Company may sell and transfer for fair value such rustproofing or protective coating business with the rights acquired hereunder without obligation on the purchaser to pay any royalty therefor. Upon any sale of such business at any time the Company shall have the right out of the proceeds of such transfer to repay itself for any losses which it may theretofore have incurred in such rustproofing and/or protective coating business, and thereafter shall divide the balance of the proceeds of such sale equally between the Company and Curtin or his representatives or assigns. 6. During the continuance of this agreement for the period in which royalty payments are to be made hereunder, Curtin shall consult and cooperate with the Company and continue such research and development with respect to the rights and inventions covered by this agreement and in the prosecution of patent rights in respect thereof and litigation for the enforcement or protection of such rights *230 as requested from time to time by the Company, so long as Curtin shall remain in the employ of the Company. * * *
[Here follow provisions for arbitration of disputes arising under the contract, and for retransfer of rights acquired to Curtin in event of termination or breach of contract.] 9. This agreement supersedes all existing arrangements between the parties hereto relating to rustproofing and protective coating, and shall be binding upon and inure to the benefit of said parties hereto, their heirs, successors and assigns. * * *
On September 30, 1937, the same day on which the above contract was executed, petitioner and his wife executed the following instrument: Agreement made and entered into on Sept. 30, 1937, between Leo P. Curtin and May F. Curtin. Whereas Leo P. Curtin has, on the date above given, acquired an interest in the metal coating and rustproofing business of Curtin-Howe Corporation, 405 Lexington Avenue, New York, N. Y., a corporation of New York, and Whereas, May F. Curtin is desirous of obtaining ownership of one-half of the interest of Leo P. Curtin in said metal coating and rustproofing business. Now, Therefore, in consideration of *231 the sum of One Dollar ($1.00) and other valuable consideration paid by May F. Curtin to Leo P. Curtin, receipt of which is hereby acknowledged by said Leo P. Curtin, on behalf of himself, his heirs, administrators, executors and assigns hereby assigns to May F. Curtin, her heirs executors, administrators and assigns, one-half (1/2), of his interest in the metal coating and rust-proofing business of Curtin-Howe Corporation, said assignment to become effective as on the date given above. Leo P. Curtin further agrees to pay to May F. Curtin within ten days after receipt her proper share of profits derived from said metal coating and rustproofing business and, likewise, if Leo P. Curtin should receive money or other valuable consideration from the sale of all or any part of the above-mentioned business he agrees to pay over to May F. Curtin her full share in accordance with the terms of the preceding paragraph In witness hereto, the respective parties have set their hands on the date above written. Leo P. Curtin May F. Curtin After the execution of this contract and the assignment of the Curtex process, the corporation engaged in missionary and introductory work in introducing *232 the product made thereunder, and spent about $25,000 in such work. The product was favorably received, and a contract was entered into between the Curtin-Howe Corporation and the General Electric Co. for its use. No sales were ever made under that contract, however, because the sale of the business as hereafter set forth, occurred before General Electric was in position to use the process. On November 11, 1940, Curtin-Howe Corporation sold to Parker Rust Proof Co. its metal coating and rustproofing business (including the patents, patent applications covering the Loxal process, the Curtex process and various other processes, of which only the Curtex process was of any considerable value). The Curtex process was not then patented, although applications had been made for certain patents in connection with it. On November 11, 1940, simultaneously with the sale by Curtin-Howe Corporation to Parker Rust Proof Co., petitioner entered into a contract with the Curtin-Howe Corporation referring to that sale, and containing the following pertinent provisions: * * *
1. Curtin acknowledges that he has received Three Thousand ($3,000) Dollars from the Company since the termination *233 of his regular employment by the Company on July 23, 1940, which payments represent retainer fees as consultant in connection with the business of the Company relating to the patents and patent applications which are the subject matter of a sale being made simultaneously herewith to Parker Rust Proof Company. 2. In connection with the sale to Parker Rust Proof Company, Curtin will, during the period commencing with the day of this contract and extending to and including November 11, 1943, perform the acts and render the services and be bound by the obligations as follows: (a) He will approve the sale of the patents, patent applications and rights referred to in the agreement between Curtin-Howe Corporation and Parker Rust Proof Company. (b) He will sign any instrument which may be necessary to perfect the transfer to Parker Rust Proof Company, its successors and assigns by Curtin-Howe Corporation of the several properties and rights covered by said agreement. (c) He agrees with reasonable promptness to notify and furnish as full information as he shall have to Parker Rust Proof Company of any and all products and processes, including discoveries and inventions within the field *234 of usefulness described in Article 1 of the agreement between Curtin-Howe Corporation and Parker Rust Proof Company, known to him at any time during the three (3) years this agreement is in force, and to give Parker Rust Proof Company his fullest aid, at Parker Rust Proof Company's expense, to enable Parker Rust Proof Company to obtain exclusive patent protection thereon. And he agrees to assign to Parker Rust Proof Company any and all products and processes, including patents, patent applications, discoveries and inventions which he makes, owns or controls during the time this agreement is in force which fall within the field of usefulness, described in Article 1 of the agreement between Curtin-Howe Corporation and Parker Rust Proof Company. [Here follow agreements by petitioner to refrain from acts which would hinder use of rights by Parker Rust Proof Company to execute necessary papers on future inventions in field of usefulness within 3 years, that he will assist Parker Rust Proof Company in prosecution of infringers or defense against attack in suits arising out of the patents, etc., covered; that he will not dispute validity of patents; nor enter the employ of any competitor *235 for three years.] * * *
3. The Company agrees that Curtin shall be employed by the Company to render services for a period of three years commencing November 11th, 1940, as consultant for the Company in connection with the patents and patent applications listed in Article 1 (a) of the Agreement between the Company and Parker Rust Proof Company, and the entire field of usefulness relating to said patents. 4. The Company agrees that the sum of Twenty-Five Thousand ($25,000) Dollars to be paid under Article 16 of the Agreement between the Company and Parker Rust Proof Company shall be paid to Curtin in consideration of the services to be rendered by him under this contract. Said payments shall not in the aggregate at any time exceed the sum of $694.45 in respect of each month which shall have elapsed after the date of the signing of this contract, but which shall be paid at the rate of $752.32 per month during 1941, $694.45 per month during 1942, and $694.45 per month during 1943, until such time as Leo P. Curtin shall have received Twenty-five thousand ($25,000) Dollars in all, provided, however, the Company shall withhold further payments to said Curtin if at any time Curtin *236 shall fail or refuse to perform the terms of this contract. This right shall not be exclusive of any other remedies for the enforcement of the provisions of this contract. At the expiration of three years from the date of this contract, or at the earlier death of Curtin, all of the said sum of Twenty-five thousand ($25,000) Dollars remaining in the hands of the Company to which Curtin, his representatives or assigns shall not be entitled under the terms of this Article shall be returned to Parker Rust Proof Company. However, should Curtin die at any time when there is not an unexcused breach of this contract, the balance of said sum of Twenty-five thousand ($25,000) Dollars shall be promptly paid to Curtin's legal representatives or assigns. * * *
The agreement between the Curtin-Howe Corporation and the Parker Rust Proof Company, to which reference is made in the Curtin agreement set out above, recites in pertinent part as follows: * * *
WHEREAS, the said Curtin-Howe Corporation and the Parker Rust Proof Company, a corporation of the State of Michigan, are involved in litigation concerning processes covered by the said patents and patent applications, and WHEREAS, *237 the Curtin-Howe Corporation and the Parker Rust Proof Company are desirous of terminating this litigation, the outcome of which is uncertain, and which has been and promises to continue to be expensive to both parties, and WHEREAS, the business of the Curtin-Howe Corporation in the said processes has not been profitable and Curtin-Howe Corporation is desirous of selling to the Parker Rust Proof Company its entire right, title and interest in and to said United States and Canadian Letters Patent and pending applications pertaining to the field of metal treatment and any and all its rights under patents owned by the Western Union Telegraph Company, and WHEREAS, Leo P. Curtin, under a certain agreement with Curtin-Howe Corporation, must approve any assignment by Curtin-Howe Corporation of its patents and applications in the field of metal treatment, and according to said agreement is entitled to share in any proceeds obtained by Curtin-Howe Corporation for the assignment of the rights of the Curtin-Howe Corporation under patents and patent applications in the metal treatment field; NOW, THEREFORE, in consideration of the premises and the mutual covenants, conditions and warranties *238 herein contained, the parties hereto agree as follows: 1. Curtin-Howe Corporation agrees to sell, assign, and transfer to the Parker Rust Proof Company, and by these presents does sell, transfer, assign and set over unto the Parker Rust Proof Company, its successors and assigns, (a) All its right, title and interest in and to the following listed United States and Canadian Letters Patent and pending patent applications and reissues and extensions of term thereof: United States Patents
1,895,568
2,120,212
1,895,569
2,121,520
1,899,674
2,127,206
1,910,593
2,127,207
2,046,061
2,132,000
2,060,365
2,210,850
United States Applications
107,297
167,478
137,376
229,221
218,223
223,473
243,030
321,569
Canadian Patent No. 338,010 [Here follows an assignment and transfer of improvements on the listed patents, future discoveries and inventions in the metal coating field, trade marks, and rights under the agreement with General Electric, together with warranties of title, warranties against foreign license, and for the peaceful enjoyment of assignee.] 3. Curtin-Howe Corporation warrants that it has the exclusive right under the United States *239 Letters Patent listed in Article 1 which are owned by the Western Union Telegraph Company, said right being exclusive in all fields except the telephone and telegraph equipment field, and that Curtin-Howe Corporation has the right to transfer, assign and set over said exclusive license to the Parker Rust Proof Company, and that Western Union Telegraph Company has no right to terminate said license. Curtin-Howe Corporation does hereby assign to Parker Rust Proof Company all its rights under said license. * * *
13. The provisions of this agreement are declared to be material and dependent and of the essence of the agreement, except that performance of obligations of Leo P. Curtin shall be dependent on the contract made simultaneously with Leo P. Curtin by Curtin-Howe Corporation, annexed hereto. Wherever notice is required under the terms hereof such notice shall be by registered mail, postage fully prepaid. Curtin-Howe Corporation agrees that it will enforce the annexed contract with Leo P. Curtin for the benefit of Parker Rust Proof Company and that it will take such proceedings as Parker Rust Proof Company shall require therefor, provided that Curtin-Howe Corporation shall *240 be indemnified by Parker Rust Proof Company for its expenses in connection with such proceedings and provided that Parker Rust Proof Company shall have the right to direct and limit such proceedings. 14. The litigation now pending between Curtin-Howe Corporation and Parker Rust Proof Company shall be terminated in such manner as respective counsel advise. 15. On the signing of this agreement Parker Rust Proof Company has paid to Curtin-Howe Corporation in full for all of the properties to be transferred to it pursuant hereto the following sums: For $1,000
Patent Number
Loxal
1895568
Loxal
1895569
Loxal
1899674
Loxal
1910593
Loxal
2060365
For $198,000
Phosphate
2120212
Phosphate
2121520
Phosphate
2132000
Vanadium
2046061
Barium Permanganate
2127206
Copper Pretreatment
2127207
Blue Oxide
2210850
U.S. Patent
107297
Applications
137376
Applications
218223
Applications
243030
Applications
321569
Applications
167478
Applications
229221
Applications
223473
Canadian Patent
338010
For $100 Each
"Curtex" Trade Mark
"Loxal" Trade Mark
16. In addition to the consideration specified in the preceding article, Parker Rust Proof *241 Company shall pay to Curtin-Howe Corporation immediately upon execution of the agreement the sum of Twenty-Five Thousand ($25,000) Dollars, which shall be held by Curtin-Hove Corporation during the term of this contract and employed for the discharge of its obligations under a certain contract entered into simultaneously by Curtin-Howe Corporation with Leo P. Curtin for the benefit of Parker Rust Proof Company, a copy of which contract is annexed hereto. Curtin-Howe Corporation further agrees that the additional sum of Twenty-five Thousand ($25,000) Dollars, to be paid under this Article, shall be paid to Leo P. Curtin, in consideration of the services to be rendered under said contract, and that said payments shall not in the agregate at any time exceed the sum of Six Hundred Ninety-Four Dollars and Forty-Five Cents ($694.45) in respect of each month which shall have elapsed after the date of the signing of this contract, and that at any time when Leo P. Curtin shall fail or refuse to perform the terms of said contract said Curtin-Howe Corporation shall be required to withold further payments to said Leo P. Curtin. * * * [Here follow provisions for disposition of balance on death, *242 or, in event of breach of contract, and that this agreement binds successors and assigns of parties.] During the year 1940, petitioner received from Curtin-Howe Corporation a total of $46,659.26, of which he reported $10,050 as salary, and of the balance of $36,609.26, he reported one-half as a long-term capital gain for the taxable year, and his wife reported the other one-half as a long-term capital gain. At no time prior to or during the taxable year did petitioner sell or license any patent, patent application, invention or secret process except those described herein, which were assigned to the Western Union Telegraph Co., and Curtin-Howe Corporation, nor did he receive any royalties therefrom. The petitioner received his scientific education at Columbia University, having received the degree of Doctor of Philosophy in 1923. His wife furnished substantial financial assistance to him while he was in college, and he agreed with her that he would divide with her on a 50-50 basis any assets of which he might later become possessed. In 1927, he purchased a one-hundred acre farm, and gave her a one-half interest in it. Of the 3,007 shares of stock in Curtin-Howe Corporation *243 received by him at the time of its organization, he transferred 1,000 shares to her. On September 30, 1937, he executed the instrument heretofore referred to, whereby he purported to transfer to her a one-half interest in his "interest in the metal casting and rustproofing business of Curtin-Howe Corporation." On November 15, 1940, he gave to his wife a certified check in the amount of $20,000. This was intended to represent one-half of the $36,609.26 received by him as the result of the sale by Curtin-Howe Corporation of the patent rights, the balance to be used to purchase a Christmas gift. This instrument constituted an attempt to assign a share of petitioner's anticipated future income. Petitioner was not engaged in the business of selling inventions, and the inventions, the sale of which gave rise to the income in question, did not constitute property held by petitioner for sale to customers in the ordinary course of his business. Opinion KERN, Judge: The first question which arises is whether petitioner is liable for tax on the entire amount received by him from Curtin-Howe Corporation upon the sale by that corporation of patents, applications for patents, and exclusive *244 licenses relating to metal treatment and processes. All of these resulted from inventions of petitioner, by him assigned to the corporation under contracts, set forth in detail in our findings, providing for the payment of certain royalties, and a share of the sale price, in the event of sale, which required the approval of petitioner. Conditions were such that no liability for royalties ever arose, apparently; in any event, none were paid. The event with which we are concerned, by which, under his assignment, petitioner became entitled to and did receive money, was the sale in 1940 of those rights to the Parker Rust Proof Co. The 1937 contract of assignment provided that Curtin-Howe would not sell these rights so assigned to it by petitioner without petitioner's consent, but that if a sale were arranged, petitioner would be entitled to receive 50% of the corporation's net profit on the sale. At the time the sale took place, however, another contract was executed between petitioner and Curtin-Howe Corporation, which provided, as we have seen, for the payment to him in monthly instalments over the period of three years, of the sum of $25,000, which was specified to be compensation *245 for his services as consultant during that period. After the execution of the November 11, 1940 agreement, petitioner received, in addition to the salary therein provided for, the sum of $36,609.26. There is no evidence how this amount was arrived at or whether it represented 50% of Curtin-Howe Corporation's net profit on the sale, or only a portion of it. There is evidence that he received that amount in that year. He reported one-half of that amount for taxation at the long-term capital gains rate, and his wife reported the other half. The two questions before us are, first, the question whether petitioner is himself taxable on the entire amount; and second, whether the long-term capital gains rate is applicable to this item of income. It is the petitioner's first contention that by his 1937 agreement with the Curtin-Howe Corporation, he transferred the invention covered thereby in consideration of a one-half interest in the metal coating business of the corporation. Even if we assume the legal possibility of acquiring such an interest in such a manner, it would still be necessary to inquire whether the petitioner did, by means of the agreement of September 30, 1937, acquire *246 an interest in the corporation's business. It is clear and unquestioned, that by that instrument petitioner transferred title to his invention to the corporation, and secured, in exchange therefor, the right to receive royalties for 17 years, and, in the event of sale, a share in the net profits of the sale. The corporation agreed not to sell the invention within the seventeen years' term of the agreement without petitioner's consent. This contract, it seems to us, by its plain terms, constituted an assignment of patents and inventions, effectuating a transfer of title, with provisions and conditions subsequent peculiar to and common in such transactions, and nothing more. It is quite impossible to construe this contract as giving petitioner any "interest in the business" of the corporation. He had thereby no right to participate in any way in the conduct of the business. Prior to the sale of the inventions by the corporation, the only rights petitioner had stemmed from the contracts of assignment and his stock ownership in Curtin-Howe. These were the rights to receive the royalties, the contingent right to share in the proceeds of the sale of the inventions, and the usual rights *247 of a stockholder. There was also a provision in the contract of September 30, 1937 (paragraph 5) that Curtin-Howe would not sell "its rustproofing or protective coating business" without petitioner's consent during his lifetime. The attempted assignment of an "interest in the business" of Curtin-Howe Corporation by petitioner to his wife is ineffective, as such. He could not assign that which he did not own. If the assignment is to be given any effect at all, it must be construed as an assignment of future income and profits expected to be realized from royalties, dividends or the sale of an asset owned by petitioner individually, or by a corporation which is obligated to account to him for a part of the proceeds of the sale. That such assignments do not have the effect of shifting tax liability on such income and profits is well established, and is here conceded by petitioner. We have not been persuaded that the respondent erred in taxing to him the entire amount received by petitioner in 1940 on account of this transaction. The next question then, relates to the character of the asset sold by petitioner, and whether he is entitled to the benefit of the lower rate applicable *248 to long-term capital gains, as petitioner contends. Section 117 (b) of the Revenue Act of 1936, provides: Definition of Capital Assets. - For the purposes of this title, "Capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. It is the respondent's position here that petitioner held the inventions and processes involved here for sale in the ordinary course of his trade or business. The pertinent facts may be briefly stated to be these: petitioner has worked as a salaried employee or officer of a corporation during his entire career. His first inventions were made during the course of his employment with Western Union under a contract which required him to transfer to that company such inventions. This he did but he received back an exclusive license outside the communications field. He transferred this exclusive license to *249 a new corporation. He received about one-fifth of all its stock, and was made its president. He was under no obligation to transfer future inventions to the corporation. Subsequently he received additional exclusive licenses under patents owned by Western Union on his inventions, and he transferred these to the new corporation on a royalty basis, and provisions for a share of the sales price, if they should later be sold. After he severed his connection with Western Union, he invented the Curtex process. He assigned this to his corporation, in consideration of an agreement to pay royalties and a share of the sales price in the event of sale. No royalties were ever, in fact, paid under either of these contracts, presumably because none were earned, although the evidence is not wholly clear. It was the sale by the corporation of the several inventions relating to metal coating, which petitioner had assigned to it at various times, and of which Curtex was the only valuable one, which gave rise to petitioner's right to receive a share of the proceeds. Altogether petitioner has applied for approximately forty patents, covering five or six basic inventions. About twenty-one of these *250 were involved in the sale by Curtin-Howe Corporation. These and the licenses in the wood preserving field are the only ones which petitioner ever assigned and for which he ever received anything of value. Petitioner contends he can not be said to have been engaged in any trade or business in the course of which inventions or patents were primarily held for sale to customers. He points out he was regularly employed by others on a salary; that he never received any royalty or other income from the sale of any patent or invention prior to the sale involved here; and that at no time did he ever claim any deduction for income tax purposes by reason of business expenses, or for depreciation. In Samuel E. Diescher et al., 36 B.T.A. 732, a partnership owned four patents, five inventions upon which applications for patents had been filed, nine inventions on which no applications had been filed, and two foreign patents and thirteen foreign patent applications. It had granted two licenses to use the U.S. patents in exchange for royalty payments. It was engaged in the business of furnishing consulting engineering service, the invention of processes and devices, and the patenting *251 and licensing thereof. In the tax year, the partnership conveyed its patents and inventions to a corporation organized for that purpose. On the question whether the gain realized from such transfer was capital gain or ordinary income, and the respondent's contention that it was not capital gain because the patents were held by the partnership primarily for sale in the course of its business, we said: * * *
As to this, the record discloses nothing in our opinion, indicating that the partnership has ever been in the business of buying and selling patents, or in developing inventions for patent and sale. So far as we know, the patents involved here are the first which the partnership has ever sold, although it has been in business for many years. All the other transactions having to do with the patents of the partnership have been connected with the licensing of their use. The basic patent involved in the exchange between the partnership and the newly organized corporation, and which represents the largest individual value among the patents and inventions exchanged, had been owned for many years by the partnership. During that time its use by other companies had been granted under *252 license agreements. It is evident that the patents and inventions here it dispute did not constitute stock in trade, held for sale by the partnership in the course of its business. In Harold T. Avery, 47 B.T.A. 538, the taxpayer, during a period of about seventeen years, had procured about twelve patents on inventions developed outside his regular hours of full-time salaried employment. Two of his earlier inventions related to calculating machines, and he arranged with a company engaged in that field for the use of one of these. This led to his employment by the company, under a contract requiring him to assign to it any inventions in that field made during the term of his employment. He later received patents on his calculating machine inventions which pre-dated his employment, one of which he sold to his employer for $30,000 payable in monthly instalments over a period of years, which he so received. He later sold the other to the corporation, and another patent in another field to another company. He also licensed two other patents to others than his employer for which he received royalties. We held he was engaged in the business of inventing and procuring patents, *253 and selling or licensing them, so that the first patent sold to the corporation, from which sale the income there involved was derived, was property held by him primarily for sale to customers in the ordinary course of business. In the case before us there were forty patents or applications covering five or six different basic ideas. Some of these belonged to petitioner's first employer under his employment contract, but they granted to him an exclusive license for their use in all fields but their own. The first of these licenses petitioner assigned to Curtin-Howe. At that time he owned 3,000 shares of its stock. This represented a considerable, although not controlling, stock interest. He participated in its organization and became its president and general manager. Later licenses he assigned to Curtin-Howe in return for the payment of royalties. The inventions he assigned in 1937, and which were the subject of this dispute, were also intended to result in the payment to petitioner of royalties. Even though these assignments to Curtin-Howe are to be considered as sales, can it be said that petitioner was in the trade or business of selling inventions or patents to customers within *254 the meaning of section 117 (b) supra? We are of the opinion that it can not. It appears unmistakably from the facts that petitioner assigned patent rights to a corporation in which he had a considerable stock interest and of which he was the directing head for the purpose of achieving their profitable development and exploitation, using the mechanics of the corporation-assignee to finance such exploitation. It is a far different situation from that in which an inventor makes sales of patent rights to several purchasers in none of which he has any proprietary interest and is motivated solely by obtaining an immediate profit. In the latter case, it can be said, as we held in Harold T. Avery, supra, that the taxpayer is in the trade or business of selling patents to customers. But in the instant case the transfers of patent rights by petitioner to only one corporation in which he had a considerable proprietary interest for the purposes indicated by the facts, do not warrant a finding that he was in the trade or business of selling patents or inventions to customers. We conclude on the facts before us that the inventions here involved were not property held by petitioner *255 "primarily for sale to customers in the ordinary course of his trade or business." The income derived from their sale, therefore, is not ordinary income, and the respondent erred in so determining. Enter: Decision will be entered under Rule 50.